## Laura J. Bartlow v. James H. Bartlow.

1. SEPARATE MAINTENANCE—*proof essential to establish right to.* Notwithstanding the defendant deserted the complainant, the burden is upon the complainant to show that she is living separate and apart from the defendant without her fault; yet the proof required is of a negative character and the most that can be expected is that she should show in the first instance that she has reasonably performed her duty as a wife, and then the burden shifts to the defendant to show that he had reasonable grounds for leaving.

2. DESERTION—*what not ground for.* Held, that the evidence in this case did not show reasonable grounds for desertion.

3. HOMESTEAD—*when deserted wife has right to possession of.* Where a wife has been wrongfully deserted she is entitled to retain possession of the homestead and no decree need be entered with respect thereto until such time as her husband assumes his marital obligations and provides another home if he should see fit to do so.

Bartlow v. Bartlow.

Separate maintenance proceeding. Appeal from the Circuit Court of Schuyler County; the Hon. Thomas N. Mehan, Judge presiding. Heard in this court at the November term, 1903. Reversed and remanded. Opinion filed June 28, 1904.

L. A. Jarman, for appellant.

D. L. Mourning and Glass & Battenberg, for appellee.

Mr. Justice Gest delivered the opinion of the court.

This is a bill by appellant, complainant below, against her husband, the appellee, for separate maintenance. Upon a hearing the court found that the complainant was living separate and apart from her husband, but not without her fault, and dismissed the bill.

The parties were married February 15, 1896. Complainant then was thirty-nine years of age and defendant was sixty-three. Both had been married before. By his first marriage defendant had nine children. Complainant had one son by her first marriage. No children were born of the second marriage.

Complainant owned substantially no property at the time of her marriage to defendant. Defendant testifies that she had two beds and bedsteads and an account or note for some amount not stated. Defendant owned, and still owns, a farm in Schuyler county of 270 acres, of the value of $11,500, as he says, a house and lot in Rushville of the value of $2,000, $900 in money loaned on interest at six per cent, and his household goods and personal effects in and about the Rushville house and lot. Upon their marriage they occupied the Rushville house, and the family consisted of complainant and defendant, Carl, a son of complainant, then sixteen years of age, and Bruce, a son of defendant, then nineteen years of age. Bruce lived in the family about a year. Carl lived there most of the time till the fall of 1902, paying his board to defendant at the price of one dollar a week as agreed upon between them, but as the defendant testified, still owes four dollars on that account. Defendant left his home and the complainant on the twenty-ninth day of December, 1902; he remained absent until

the seventh of February, 1903, when he returned, and he and complainant thereafter lived together as man and wife for two weeks, when he left her again and since has not returned. The question is: Is the complainant living separate and apart from her husband without her fault? Otherwise put, the question is: Did the defendant desert his wife wilfully, and without any reasonable cause? There is no question that he left her wilfully, that is, knowingly and with the intent to remain absent, so that the material inquiry is: Did he desert her without reasonable cause? Ordinarily, in suits under the statute providing for separate maintenance, the wife leaves the husband, and the burden is cast upon her of showing that she had reasonable ground for leaving him. In this case the husband leaves the wife, and while the burden is still upon her to show that she is living separate and apart from her husband without her fault, yet it is of a negative character. The most that she can be expected to show in the first instance is that she reasonably performed her duty as a wife, and then the burden is cast upon the husband to show that he had reasonable ground to leave her, and upon the whole case presented the question is: Is the wife living separate and apart from her husband without her fault? It may be reasonably taken for true that the defendant would state his case as favorably to himself as the truth would allow. What is his testimony? He says: "My wife and I got along first rate for a while, just as good as I could ask, for as much as three years." One of his first troubles with her was that she pouted when he blamed Carl, her son, for the bad condition in which he found his horse when they were about to drive to a relative's home to a family dinner. The next trouble was over the matter of two dollars that he had lent to his son-in-law, Fred Greer. Maude Greer, his daughter, did some wall-papering for him and he balanced the two-dollar account against the papering, and Mrs. Bartlow "showed her spirit up; she objected to it." Then they had trouble about their contract, she saying she could not live on $500, " and of course that would get up a contention and

she would get out of humor; I would not agree that it should be changed, and she got to figuring on my death." His daughter, Maude, and her husband, Mr. Greer, went west to Washington; Maude was dissatisfied and came back to Rushville within a month, and then started back again to Washington. Her husband died there while she was on the way, and she wanted defendant to come after her, and that made trouble. Mrs. Bartlow did not want him to go, but he went and brought Maude back to Rushville, and to his home, where " my wife received us cool enough. She did not say anything out of the way. She would not sleep in the bed with me for three nights before I started. She was out of fix with me because I was going." Defendant rented a house for Maude and then Maude concluded she would not take it, and she stayed at defendant's home, and next day he took her to her father-in-law's home when it was raining, and Mrs. Bartlow said she would not ride again in his buggy and would not help clean it. "One time she told me to get up and build the fire; I told her I did not feel able to build the fire, and did not want to get up. She came to me in the bed and grabbed me by the shoulders and jammed me in the bed. She says, ' You old hypocrite, you get up and go and build the fire;' and when I got up she clinched me and swung me round and round and shoved me in a chair." At another time shortly after this, "I said I was going to my farm at Bruce's, and was putting on my coat, and she wrenched it off and says, 'You just be quiet and stop this,' and locked the door on me and I did not go. She cussed me one time; that was the only time that she used language that was not becoming to a woman. * * * One evening I says, ' I am not going to stay here if you keep up this racket.' I got up and went out to the buggy shed and got the halter and started to get my horse; she came out and clinched me; she says, 'You just come back in the house; you are not going a step.' I insisted on her letting me alone; she kept jerking and pulling at me; she says, 'Go into the house and I will not bother you;' I went in and she did hush up and went to bed. * * *

The main cause of our trouble was the contract; she became dissatisfied with the amount of the contract; she was jealous of me; she told me I thought more of any woman in the neighborhood than I did of her. If a woman got in the buggy to ride with me, she would show her disposition up; get mad at me. * * * She did not tell me in so many words, but she gave me to understand that me and my daughter had improper relations. * * * After I left her the first time she wanted me to come back and I went back. I said to her if I come back I must have the privileges I have been denied, such as to go to places around what she opposed me unless she went with me, to Washington or Kansas or the State Fair. I was to give my children anything I wanted and she was not to give any trouble about that. I asked her to look after Maude and her little children and she said she would. She said she would even divide her fruit with her; I lived with her then two weeks; I began to look for a place for Maude. Now I says, ' Are you going to be willing for me to buy this place for Maude?' She says, 'You can buy the finest mansion in town for her if you want to.' I says, ' Will you consent for me to carry some milk to these children?' She says, 'You can give her the cow if you want to.' The next Saturday she shaved me and she asked me to go out to her aunt's and I refused. She finished shaving me, all but the back of my neck, and quit, and got mad when I suggested her going to Maude's and she said Maude was a liar, and I said, ' It's no use talking, this thing is just like it always was,' and I made an attempt to get my clothes, and she took the grip and threw it in the closet. This was Saturday, and I left on Sunday morning." On the 24th of February, after the defendant had left the second time, complainant sent a letter to him, in which in indirect but unmistakable terms she charges him with criminal intimacy with his daughter Maude. " I left her the last time because I was satisfied I could not live with her and have any peace. I told Mrs. Demaree she was jealous of me and Maude. She would say that me and Maude were riding around in the buggy all

the time, and I would not take her, and she showed a disposition. * * * She never said to me, but she wrote in that letter, and that convinced me that she had that opinion of me. * * * The serious trouble began Monday before Thanksgiving, 1902, about the time she took in the boarder. * * * Whenever we would have any argument or trouble I would insist on her taking so much money and let me have the rest to myself. * * * I don't remember that she laid hands on me till November, 1902. * * * She would wade through the high grass after the cow, and come in fighting mad at the cow, and it worried me and she knew it. * * * One morning when the cow was eating, the cow heard her noise and the cow turned around and left her feed and looked up with her head up like a deer. * * * When I came back after the six weeks, she occupied the room with me and the bed, and we lived together as man and wife during those two weeks. * * * When I left the first time and when I left the second time I went to quite a good many stores and notified them not to trust her."

The defendant's testimony covers many pages of the abstract. The foregoing contains all that is of any significance and much that is of no significance. There is more that seems to be utterly puerile, of no value whatever in the determination of the matter in issue. We have stated only his testimony; no witness enlarges or strengthens his position. The evidence on the part of the complainant is contradictory of defendant's proof, except that she admits writing the letter above mentioned; she begs him to come back; says she was angry when she wrote the letter.

Taking the proof only on the part of the defendant, does it justify him in leaving his wife? He deserted her. If after the lapse of two years she brought suit against him for a divorce on the ground of desertion could he successfully defend on the proof in this record? His defense, if any, would be cruelty. This record shows no such cruelty, even if often repeated, as would justify a decree of divorce. He states two instances that might possibly be exaggerated

into physical violence. One was when she jammed him in the bed and swung him round and round and shoved him in the chair; the other one was when "she just laid hold of me violently." Is this extreme cruelty within the meaning of the law? All the rest of his testimony is about wordy conflicts, acrimonious debates, pouting on her part, prayers and scripture readings for her benefit on his part, complaints by her of his daughter Maude, charges by him against her son Carl, quarrels about the cow and the horse, about the buggy and the harness, about the peach tree and the bible, and many other things in which, according to his story, she struck a high religious key and he a lower one but equally pious. Conceding that she gave him some cause for leaving her the first time, what reason was there for his leaving the second time? The so-called acts of violence took place before he left the first time. He came back and as he says, they lived together as man and wife for two weeks, when he left again. The conditions demanded by him upon which he would return were " I must have the privileges I have been denied, such as to go to places around what she opposed me unless she went with me, to Washington, or Kansas, to see my daughter, or if I saw fit to go to the State Fair I was to go," etc. Not a word about her physical treatment of him; no condition that she should not swing him around and jam him in the bed or "clinch" him or the like. It is manifest he had no fear of such things. The record is barren of any act of violence during those two weeks. They had some words about Maude and a house for her, and about the cow, and that was all. He says he was afraid of her and yet she shaves him on the Saturday before he left, and he leaves on Sunday while she was absent from the house. There was no reason whatever for him to leave the second time. The most serious thing she did was to write the letter charging him with improper relations with Maude, but this was after he left her the second time and after she sent it she went to the defendant and begged him to come back and told him she was sorry she had written it.

Bartlow v. Bartlow.

The law does not favor divorces, or separations without divorce. The policy of our law is to maintain the marital relation. The home is regarded as the unit of our civilization; the sanctity of marriage lies at the basis of our civilization; that relation cannot be disturbed for light or trivial reasons. The marriage contract cannot be made and unmade at pleasure. It concerns more than the immediate parties; the state has an interest in it, a deep and abiding interest; society has an interest in it; children and grandchildren have an interest in it. It is more than a contract; it is a status, and it cannot be changed at caprice. The ease and frequency of divorce and separation in this state has become a matter of unenviable notoriety and of just contempt among decent people. We are not inclined to give further ground for such contempt. At common law a wife living separate and apart from her husband, without her fault, carried her husband's credit with her to the extent of supplying herself with necessaries. Our statute of separate maintenance is intended to take the place of and be more beneficial than the common law remedy. A deserted wife now, instead of begging a credit at the stores, applies directly to the court for money from her husband, and the law grants it in any case where she has been deserted and would be at common law entitled to get credit on her husband's account. This defendant left his wife, as he says, for good. He intended not to return. He notified the storekeepers in Rushville, where they lived, not to give credit to her on his account. He left her with a house to live in but no means with which to live. She had cared for his home, cooked, washed and ironed for him, fed his pigs, chickens, cow and horse; built the fire to warm him and performed the menial service of shaving him, and that to the last day before he deserted her. She is manifestly no saint; neither can he be enrolled in that company. They were both of full age at marriage. The law presumes they knew what they were about when they married. No sufficient reason is shown for their separation or for his discharge from his marital obligation. The bill prays that

the Rushville premises may be decreed to complainant as her homestead. She is now in possession of them as her homestead and entitled to remain there until her husband resumes his marital obligations and provides her another home if he should think fit so to do; hence no specific decree for homestead is required.

The decree of the Circuit Court is reversed and the cause remanded with directions to enter a decree for separate maintenance of complainant in such terms and with such provisions as shall appear to the Circuit Court equitable.

*Reversed and remanded.*