**Charles Crook, Appellant, v. Irene L. Crook, Appellee.**

**Gen. No. 43,505.**

Opinion filed November 19, 1946. Released for publication December 3, 1946.

URBAN A. LAVERY, of Chicago, for appellant.

ELLIS & WESTBROOKS, KIMBALL SMITH and EDWARD M. BYRD, all of Chicago, for appellee; RICHARD E. WESTBROOKS, of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

On February 23, 1940, Charles Crook, plaintiff, filed a complaint for divorce in which he charged his wife, Irene L. Crook, defendant, with cruelty and habitual drunkenness. Defendant filed an answer denying the charges and also filed, on March 18, 1940, a counterclaim asking for separate maintenance. Several months after defendant filed her counterclaim plaintiff filed an amendment to his complaint in which he charged defendant with committing adultery with one John Doe. The cause came on for trial in 1943, before Judge SCHWARTZ and a jury, and a verdict was returned finding defendant guilty of adultery and habitual drunkenness. The jury further found that defendant, counter-plaintiff, was not living separate

and apart from plaintiff without fault on her part. Plaintiff produced as witnesses Vera Roberts and Aaron A. Anderson, who gave testimony tending to prove the charge of adultery. Shortly after the return of the verdicts defendant filed a verified motion for a new trial which contains, *inter alia,* the following:

"Since the hearing on motion for new trial, the defendant has become apprised of the fact that the testimony of the witnesses for the plaintiff presented to the court to sustain his charges of Adultery, is fraudulent and untrue. The witnesses who testified in support of the plaintiff's charge of Adultery, Aaron Anderson and Vera Roberts, have made an affidavit stating that the testimony which they gave at the trial of the cause, was false and untrue.

"That from the affidavits attached hereto, it appears that the plaintiff, Charles Crook, well knew that the testimony of the witnesses, Aaron Anderson and Vera Roberts, was untrue, before he offered them as witnesses on said trial; that the said Charles Crook has imposed upon the court by his conduct in having the said witnesses to give to the court false and untrue testimony against the defendant.

". . .

"The information which clearly establishes the fact that there was no basis for the charge of Adultery, came to the defendant's knowledge through the following affidavits made by the plaintiff's witnesses Aaron Anderson and Vera Roberts in the presence of a Notary Public and a witness, and a copy of the said affidavits are attached hereto, as an additional reason for the granting of a new trial.

"Wherefore, the defendant moves that the verdicts of the jury be set aside and that she be granted a new trial."

Vera Roberts states in her affidavit that "the said Charles H. Crook induced her to testify in his behalf

in the recent divorce case heard before the Honorable Judge ULYSSES S. SCHWARTZ. · . . . that during the months of June, July, August and September of 1939 and April and May of 1940, she did not see Cora Griffith at 439 East 48th Street and that she was not present at any time with the said Cora Griffith as so testified before the Court, at the above address. . . . that the testimony as given before the Honorable Judge ULYSSES S. SCHWARTZ was incorrect and that she did not at any time see the said Irene Crook in the adulterous act with John Doe in a bedroom. . . ."

Anderson states in his affidavit that he would not have testified against defendant if she had not taken furniture that belonged to him and refused to return it; that plaintiff promised him that he would reimburse him for the furniture and that plaintiff did give him $150 as a part of the said reimbursement; "that the testimony given at the hearing in the above mentioned matter concerning the alleged adulterous acts of the said Irene Crook and John Doe, unknown to him, was not correct and he was at the time residing at 531 East 41st Street. . . . that he has never seen Irene Crook in any bedroom with any man at any time. . . . that he was never at any time present at 439 East 48th Street when Corry Griffith and Vera Robinson were at the above address. . . ."

Thereafter Judge SCHWARTZ entered an order "that the motion of the defendant Irene L. Crook to set aside the verdicts of the jury . . . and to grant her a new trial, be and the same is hereby allowed, and the said several verdicts are hereby set aside and a new trial is hereby granted to the said Irene L. Crook."

The strained argument of plaintiff, that the record does not clearly show that Judge SCHWARTZ granted defendant a new trial upon the ground that the verdicts of the jury had been procured by perjured testimony, is an afterthought and without merit. In-

deed, plaintiff admitted, in effect, the truth of defendant's charge in her motion for a new trial when he thereafter abandoned that particular charge of adultery and in his amended complaint, filed June 2, 1944, made no mention of that charge but made a new and different charge of adultery, viz., that defendant committed adultery with John Doe on the night of May 28–29, 1944. In the face of the record, that plainly shows that plaintiff procured the verdicts of the jury in the first trial upon perjured testimony procured by him, his present counsel, who took no part in the trial of the cause, makes the bold claim that "the trial Court should have started out on this second trial—as this Reviewing Court must start on this Record—with the damaging fact (so far as Mrs. Crook is concerned) that she had been found guilty of adultery by a jury on the first trial of this case," and "she stood before the trial Court—and she now stands before this Reviewing Court—with a stain on her character, because a jury of her peers has found her guilty of prior marital misconduct." The second trial of this cause, upon the amended complaint, took place before Judge JOHN C. LEWE, without a jury. The trial started in December, 1944, and did not end until some months thereafter. The transcript of the testimony contains 1,592 typewritten pages and the contention of defendant, strenuously argued, that the transcript filed is not a complete record of the proceedings, is not without some merit. On June 22, 1945, Judge LEWE entered, *nunc pro tunc* as of June 19, 1945, a second final decree—a supplemental decree. In the decree entered by Judge LEWE on March 9, 1945, it was decreed, *inter alia*:

"That the equities are with the defendant, Irene L. Crook, and that she has fully sustained the allegations of her counterclaim for separate maintenance, and is entitled to a Decree of Separate Maintenance, as provided by the Statute;

"That the plaintiff, Charles Crook, has failed to sustain the charges made in his Amended Complaint, and the said Amended Complaint should be dismissed for want of equity at the costs of the plaintiff;

"That the defendant, Irene L. Crook, is now living separate and apart from the plaintiff, Charles Crook, without any fault on her part;

"That the defendant, Irene L. Crook, is entitled to an allowance under the Statute of Separate Maintenance, attorneys' fees, and such other costs and expenses as may be found to be reasonable and just in this cause."

Plaintiff appeals from that decree.

Plaintiff contends that "trial court erred in not finding the issues of fact from the evidence in favor of the Plaintiff Husband and granting him a divorce; and in not finding the issues of fact on Defendant's counterclaim against her and denying her any relief by way of separate maintenance"; that "the finding of the trial Court in favor of Mrs. Crook on the evidence in this Record is an incomprehensible thing and a shocking miscarriage of justice."

The parties were married May 25, 1919. Plaintiff was then a Pullman porter and defendant was a teacher in the public schools of Tennessee and had previously taught in the Colored Agricultural and Normal University in Langston, Oklahoma. Neither of the parties was then possessed of any considerable means. Subsequent to the marriage plaintiff engaged in the business of an undertaker and his place became known as the Crook Funeral Home. Defendant materially assisted him in the conduct and development of the business until 1939, when plaintiff refused to allow her to have anything further to do with the business. The parties had one child, Dolores, who is now married to a man named Collins. Defendant's health became impaired in 1936, after which time she suffered numerous illnesses, one of which, pneumonia, confined her

in a hospital for months. She also underwent several operations. It is practically undenied that plaintiff abandoned defendant and the child in July, 1939. He admitted that he left home in 1939 and did not return, and that his wife and Dolores continued to live there. It is clear that for some years, prior to the abandonment, plaintiff was anxious to get rid of his wife and that he preferred to have her secure a divorce. Defendant testified that plaintiff told her in 1938 that he did not want her anymore, that he wanted a divorce and for her to go down and talk with his attorney; that she went to his attorney's office and the attorney said to her, "Mrs. Crook, you can't make a man live with you and stay with you unless he wants to," and he suggested that she agree to get a divorce, that she should go away for a year. Plaintiff made no attempt to refute this important evidence. Defendant further testified that a few days thereafter plaintiff told her, "You might as well leave. You might as well give me a divorce because there is going to be hell here right now in the house," to which she replied, "I am not moving, I am not leaving home"; that on another occasion he said to her, "Whenever, down home where I lived, whenever a mule gives out, they always replace him with a new mule"; that at the time he made this statement she was just recovering from an illness. Dr. Dove, the family physician, attended defendant in all of her sicknesses and operations. The contention of defendant's counsel that the evidence conclusively shows that plaintiff had "systematically schemed to cast off his wife against whom he had no decent grievances," is fully justified by the record.

In the trial before Judge LEWE plaintiff based his right to a divorce upon the theory of fact that two police officers and several other parties found defendant in the act of adultery with one Jones on the night of May 28–29, 1944. Defendant and Jones testified that the said evidence of the police officers and other

parties was false, and they denied that they ever committed adultery. Defendant testified that on the evening of May 28, 1944, she became very ill from something that she had eaten, and that she was treated at her home that evening by Mrs. Valentine, a registered nurse, employed at the Cook County Hospital. Mrs. Valentine testified that she came to defendant's home between 9 and 9:30 of the evening of May 28 and found defendant trying to vomit; that she gave defendant bicarbonate of soda, which treatment did not relieve her; that she put defendant to bed and gave her an enema, which produced no result; that she called Dr. Dove on the telephone and informed her of defendant's condition; that she, the witness, was compelled to leave the apartment at 10:20 p. m. in order to get to her work at the County Hospital at 11 o'clock but that before leaving she requested Mr. Jones to remain in the apartment until Mrs. Callie Broxton arrived to take care of defendant, and that he promised to remain. Dr. Dove testified that about 9 or 10 o'clock the night of May 28 she received a telephone call informing her that Mrs. Crook was ill and that between 11 and 12 o'clock she got another telephone call to come, as defendant was very ill; that she dressed and proceeded in her car to the home of defendant; that she found her very ill and in bed; that her face was pallid and there was "distension in the hypogastric region, difficult breathing. I gave her a dose, hypodermically, of one-twentieth of a gram of apomorphia. That is a type of morphine that evaporates the gastric content of the stomach." The doctor further testified that on May 27 defendant called at her office, at which time she put in defendant "a vaginal pack, for drainage," and that she removed this pack from defendant on the evening of May 29 and then put in "an insufflatis of silver picrate powder"; that she also gave defendant something for her nerves; that the packing consisted of "a big rosebud yarn tampoon, it is fluffy when you

put it in. You have got to put it in with a speculum. When it comes out it is a small thing . . ." The doctor further testified that she had been treating defendant for a "super vaginal-hysterectomy" since 1942; that in 1942 she suspected malignancy, but that an operation performed on defendant showed "a uterine fibroid." A number of other witnesses gave testimony tending to support defendant's claim that the testimony of the two police officers and others, that she committed adultery with Jones on the night of May 28–29, 1944, was false.

If the chancellor did not believe the testimony offered by plaintiff as to the alleged adultery of defendant with Jones, he would be justified in concluding, after a consideration of all the facts contained in the record, that the charge that defendant committed adultery with Jones was but a second effort of plaintiff to get rid of his wife through perjury and fraudulent means. Counsel for plaintiff admits, in his brief, that "the evidence was violently conflicting"; that "It was a confusing, baffling case all the way through," and he makes the following significant statement: "It is common knowledge for all veteran lawyers and veteran judges that both wives and husbands (for some peculiar reason) consider that they have a strange license or excuse for fabricating evidence in divorce cases. It is equally common knowledge to all lawyers and judges that the parties to a bitterly contested marital case are generally able to induce their 'close friends' to aid and support them in such questionable tactics." Judge John C. Lewe, an able and experienced chancellor, tried this cause, and the record shows that he conducted the proceedings fairly and impartially. Plaintiff's counsel admits that the chancellor "utterly rejected and held as spurious, the entire testimony of the two police officers (as well as the testimony of the two private detectives) about that 'raid.'" Counsel states, in plaintiff's brief: "So strongly are we con-

vinced of the veracity of these police officers, that we are putting entirely to one side all the other testimony in this case so far as Mrs. Crook's conduct or misconduct is concerned, and are pinning our faith on the story of these officers. alone.'' Plaintiff's present counsel seems to assume that there is a legal presumption that police officers are more likely to tell the truth in the trial of a cause than other witnesses. There is, of course, no such presumption. When a man becomes a police officer he is either an honest or a dishonest individual, and the mere fact that thereafter he wears a uniform does not change his character. In determining the credibility of a police officer and the weight, if any, that should be attached to his testimony, the same fair tests are applied as are legally applied to the testimony of any other witness. . While counsel for plaintiff complains bitterly of the chancellor because he refused to believe the officers' testimony, we are satisfied, after studying the evidence of the police officers and considering it in the light of all the other facts and circumstances in the case, that the chancellor was fully warranted in disbelieving the testimony of the officers. The fact that plaintiff was determined to get rid of his wife and that, in the first trial, he had attempted to bring about this result by perjury and fraudulent means, stands out like a mountain peak in the evidence.

■ Many years ago our Supreme court, in *Calvert v. Carpenter,* 96 Ill. 63, stated (pp. 67, 68):

''It can scarcely be repeated too often, that the judge and jury who try a case in the court below have vastly superior advantages for the ascertainment of truth and the detection of falsehood over this court sitting as a court of review. All we can do is to follow with the eye the cold words of the witness as transcribed upon the record, knowing at the same time, from actual experience, that more or less of what the witness actually did say is always lost in the process of tran-

scribing. But the main difficulty does not lie here. There is an inherent impossibility of determining with any degree of accuracy what credit is justly due to a witness from merely reading the words spoken by him, even if there were no doubt as to the identity of the words. However artful a corrupt witness may be, there is generally, under the pressure of a skillful cross-examination, something in his manner or bearing on the stand that betrays him, and thereby destroys the force of his testimony. Many of the real tests of truth by which the artful witness is exposed, in the very nature of things can not be transcribed upon the record, and hence they can never be considered by this court. For this reason the rule is firmly established, that where, as in this case, there is an irreconcilable conflict in the testimony, this court will not reverse the judgment of the trial court, where the evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict.''

■■ The findings of the chancellor in the instant case have the same force and effect in a reviewing court as the verdict of a jury. In *People v. Hanisch,* 361 Ill. 465, 468, the court said: ''Whatever may be the rule in other jurisdictions, we firmly adhere to our often-asserted belief that it is the province of the jury, alone, to determine the weight of the evidence and the credibility of witnesses. If it were not so there would be little use for the jury system. The jury, as a fact-finding body, is of such importance that an abridgment of its functions in this regard and an appropriation of them by the judges would mean the forsaking of a valued tradition in our system of jurisprudence. The utmost caution should be exercised not only by the trial courts but by the reviewing courts to uphold the sanctity of the trial by jury.'' But we are not obliged to rely upon the rules laid down in the *Hanisch* case in order to sustain the findings of the chancellor in the instant case, because, after a careful review of the

record, we find ourselves in full accord with his findings upon the vital questions involved in this proceeding.

Plaintiff contends that the chancellor failed to separate the issues of the divorce complaint from the issues of the separate maintenance proceeding and that while it was proper for the chancellor to hear both actions in one trial, it should have been done in a logical and rational fashion; but that the court "made a sort of legal 'Irish stew' out of the two separate law suits before it," and permitted the two issues to be "thrown together" and "cooked in one pot," and that the procedure which followed resulted disastrously to the rights of plaintiff. We are satisfied from an inspection of the record that this contention is a mere after thought, and without merit. The counsel who now raises this contention did not take part in the trial of the cause and he has failed to call our attention to any place in the record where plaintiff's counsel who did take part in the trial made any objection or complaint to the procedure followed by the chancellor. It is conceded that the chancellor had the right "to hear both actions at one trial," and the record shows that the learned chancellor fully understood that there were two issues to be decided in the proceeding and that plaintiff's rights were not adversely affected by the fact that the two issues were tried in the one hearing. The argument that defendant (cross-plaintiff) failed to make out a *prima facie* case in support of her counterclaim hardly merits serious consideration. As we have heretofore stated, the evidence conclusively shows that plaintiff abandoned his wife, child, and the family home in July, 1939, and that he never returned to them or his home; that for a number of years he wanted a divorce and tried to force defendant to commence divorce proceedings against him; that he had his lawyer urge her to commence divorce proceedings; that it was suggested that a settlement of

$10,000 would be made if she would secure a divorce or consent to plaintiff's securing one; that defendant refused her consent to a divorce and stated that she was going to remain in the home. Plaintiff admitted the abandonment, and he made no effort to justify his act. In a coarse, brutal way he told his wife that she was played out and that he wanted a new wife. In *Bartlow v. Bartlow,* 114 Ill. App. 604, the court said (p. 606): "Ordinarily, in suits under the statute providing for separate maintenance, the wife leaves the husband, and the burden is cast upon her of showing that she had reasonable ground for leaving him. In this case the husband leaves the wife, and while the burden is still upon her to show that she is living separate and apart from her husband without her fault, *yet it is of a negative character. The most that she can be expected to show in the first instance is that she reasonably performed her duty as a wife, and then the burden is cast upon the husband to show that he had reasonable ground to leave her. . . ."* (Italics ours.) The record shows that plaintiff's counsel paid scant, if any, attention to defendant's counterclaim for separate maintenance as they confidently expected that plaintiff's charge of adultery against his wife would be sustained by the chancellor, which ruling, if it had been made, would have disposed of defendant's counterclaim.

Plaintiff contends that "real property rights were improperly included in Mrs. Crook's separate maintenance decree." In support of this contention plaintiff states that the chancellor awarded to defendant an apartment in her husband's home and building and this was an attempt by the chancellor to give the wife "what was in effect certain property rights in the real estate of the husband." Counsel makes an unfair argument in support of this contention. The record shows that the chancellor held that he had no jurisdiction over plaintiff's property and that he would

make no order in reference to the same. It is true that the original decree entered by the chancellor on March 9, 1945, contained the following provision: ''It Is Further Ordered that the said Irene L. Crook continue to occupy the second apartment, 4638 South Indiana Avenue, Chicago, Illinois, which she now occupies, and that her occupancy is to remain in *status quo* until the further order of this Court.'' That decree also contained a provision that the permanent support and maintenance of defendant was reserved until the further order of the court. Before the second final decree was entered on June 22, 1945, there was an extended hearing before the chancellor upon the question of defendant's support, attorneys' fees, etc. The record shows conclusively that at that time the chancellor again stated that he had no jurisdiction over plaintiff's property and that he would make no order in reference to the same. Counsel for defendant asked the court to enter an order restraining plaintiff from putting defendant out of the apartment, and the chancellor refused to make such order. In view of the instant contention of plaintiff the following statement made by Mr. Lavery to the chancellor is significant: ''It seems to me the Court ought to say whether Mrs. Crook remains in the apartment or not. I don't think it is fair to leave the situation where Mr. Crook is at the option of Mrs. Crook with respect to that matter. I think the Court ought to say that,'' to which statement the court responded: ''I have no jurisdiction over this defendant's [plaintiff's] property.'' It is conceded that the chancellor made no order in the second final decree that affected plaintiff's property. That decree merely gave Mrs. Crook a cash award of $40 per week and did not pass upon the question as to her right to continue in the apartment. Counsel for defendant insisted that the apartment used by the latter constituted a homestead and that the chancellor had the right to enter an order restraining

plaintiff from commencing proceedings to oust her, but the chancellor stated that he had no jurisdiction to enter such an order. The record does show that in the course of a colloquy between the chancellor and the counsel the chancellor stated that he had made an allowance to defendant of $40 per week and he thought that if defendant remained in the apartment plaintiff should be given a credit, upon the allowance, of $67.50 per month. As we read the record this statement of the chancellor seemed to meet with the approval of plaintiff's counsel. The contention of plaintiff that the decree affected plaintiff's property rights is without the slightest merit.

Plaintiff contends: "This case must be reversed because of the erroneous rulings of the trial Court as to attorneys' fees. There was no adequate proof whatever of such fees." The chancellor allowed defendant, in the second final decree, attorneys' fees of $4,310. Counsel for defendant justly complains that a considerable part of the evidence and proceedings in connection with the hearing of the verified petition of defendant for the allowance of alimony and solicitors' fees is not abstracted. The services of the attorneys for defendant were rendered in an unusual proceeding. For five or six years plaintiff had been engaged in a scheme to get rid of his wife by perjury and fraudulent means, and defendant's counsel protected her rights in an able and courageous manner. The fact that her counsel spent a great many hours in her defense was due to the conduct of plaintiff. In furtherance of his scheme to get rid of his wife plaintiff resorted to illegal means and defendant's attorneys were compelled to be on the alert constantly to prevent the scheme from succeeding. The chancellor, after hearing the evidence, found that defendant's counsel had spent in the trials and preparation for the same, and in necessary briefing and reading work, 431 hours, and he allowed compensation for the same at the rate of $10 per hour.

He also allowed for expenses incurred by counsel, $191.52, making a total allowance of $4,501.52, from which was deducted $375 theretofore paid to defendant's counsel. We are satisfied that the chancellor was fully justified in making this allowance.

The decretal judgments of the Superior court of Cook county from which plaintiff has appealed are affirmed *in toto*.

*Decretal judgments affirmed in toto.*

SULLIVAN, P. J., and FRIEND, J., concur.